# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 11/14/2022 12:00 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
Case 2:23-cv-00135   Document 1-12   Filed 01/09/23   Page 2 of 47   Page ID #:12

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: David Sotelo

GEOFFREY C. LYON (Cal. Bar No. 132747)
*glyon@lyonlawyer.com*
**LYON LAW PC**
3605 Long Beach Blvd Ste 311
Long Beach, CA 90807
Tel: (562) 426-2112; Fax: (888) 239-2462

Attorney for Plaintiff,
THUHONG DO

## LOS ANGELES COUNTY SUPERIOR COURT

### STANLEY MOSK COURTHOUSE - CENTRAL DISTRICT

| | |
|---|---|
| THUHONG DO,<br><br>             Plaintiff,<br><br>vs.<br><br>SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA; and DOES 1 to 10,<br><br>             Defendants. | Case No.  22STCV35733<br><br>**COMPLAINT FOR DAMAGES FOR DISABILITY DISCRIMINATION AND WRONGFUL TERMINATION IN EMPLOYMENT AND RELATED CLAIMS**<br><br>Unlimited Jurisdiction<br>Jury Trial Demanded<br><br>Judge: To be assigned<br>Dept: To be assigned<br><br>Trial Date:  None Set |

-1-
COMPLAINT

COMES NOW Plaintiff THUHONG DO ("Plaintiff") and for Plaintiff's causes of action against Defendant SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA ("Employer"), and DOES 1-10 (collectively, "Defendants,"), allege as follows:

**I.**

**SUBJECT MATTER JURISDICTION**

1.      This action is brought pursuant to California Govt. Code sections § 12940; § 12945.2; Labor Code § 1102.5; California tort law and Civ. Code § 3294.

2.      Plaintiff has timely exhausted Plaintiff's administrative remedies with respect to the named defendant(s).  True and correct copies of Plaintiff's administrative complaint to, and Right-To-Sue Notice from, the California Department of Fair Employment and Housing ("DFEH") is attached hereto as Exhibit 1 and incorporated herein.

3.      This Court has subject matter jurisdiction over the causes of action alleged in this complaint.

**II.**

**PERSONAL JURISDICTION AND VENUE**

4.      At all relevant times, Plaintiff THUHONG DO was an individual residing in the County of Los Angeles, State of California.

5.      At all relevant times, Defendant SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA, is and was a corporation organized under the laws of Saudi Arabia authorized to do and doing business in the County of Los Angeles, State of California.

6.      The violations of law described in this complaint have been committed within the County of Los Angeles, State of California.

7.      Pursuant to section 393 of the California Code of Civil Procedure, the County of Los Angeles is a proper and legal venue for this case.

8.      The true names and capacities of the Defendants named herein as DOES 1 to 10, inclusive, whether individual, proprietorship, partnership, corporate, associate, alter ego, or otherwise, are unknown to Plaintiff who therefore sues such Defendants by fictitious names pursuant to California Code of Civil Procedure Section 474.  Plaintiff will amend this complaint to show such true names and capacities when they have been determined.

9.      The wrongful conduct of Employer set forth in the General Allegations and various Causes of Action proximately caused Plaintiff to suffer damages, injuries, loss and/or harm, including but not limited to physical, mental and emotional injuries and distress, pain and suffering, lost wages and benefits and health care expenses, and other general, special and statutory

damages in amounts to be proven.

### III.

### GENERAL ALLEGATIONS

10.     Plaintiff ThuHong Do ("Plaintiff") was employed by Defendant SAUDI ARABIAN AIRLINES CORPORATION dba SAUDIA ("Employer") on or about March 1, 2014, through Plaintiff's termination on or about June 24, 2022. Plaintiff worked in the Operations Department at Employer's station at Los Angeles International Airport 380 World Way, Suite 3430 Los Angeles, CA 90045. Plaintiff's job title was "Senior Admin Coordinator." Plaintiff worked under immediate supervisor Los Angeles Station Supervisor Iman (also spelt "Eman") Abaza ("Supr. Abaza"), Country Manager for the United States Khalid Alehedeb ("Mgr. Alehedeb"), Saudia Arabian Airlines Corporation Operation Manager for the United States Bassam Alsadoon ("Mgr. Alsadoon"), Senior Administrative Coordinator Lina Salah ("Cood. Salah"), and General Manager Abdullah Alhuwaifi ("Mgr. Alhuwaifi"). Plaintiff handled daily communications between Employer and the authority for Los Angeles International Airport. Plaintiff also handled all billing for the Employer's vendors and Employer, reporting any complaints from vendors to upper management. At all relevant times, Plaintiff performed Plaintiff's duties competently and satisfactorily, and Employer's stated reasons for termination of Plaintiff's employment were pretexts for unlawful discrimination and retaliation.

11.     Beginning in or about March 2014, and continuing until Plaintiff's termination, Plaintiff and other co-workers were denied their regularly scheduled 1-hour long lunch break. Plaintiff was forced to work from 9 am to 5 pm daily with no lunch breaks or other opportunities to rest. In addition, Plaintiff's role necessitated that she sat in her chair with little opportunity to move for most of the day. With no lunch or other breaks, Plaintiff's ability to move was severely limited while working.

12.     Plaintiff complained to Supr. Abaza and pointed out that lunch breaks are guaranteed under the Benefits section of the Employee handbook. In response, Supr. Abaza claimed she did provide lunch breaks. Supr. Abaza was referring to occasions when she asked individual employees if they wanted to get coffee with her. Supr. Abaza asked employees to accompany her randomly, with no adherence to regulation. Plaintiff responded to Supr. Abaza by explaining that it was unacceptable according to state regulation to not provide regular lunch breaks. Supr. Abaza claimed that regularly scheduled lunch breaks would be bad for business, especially on "flight days." These days are when major flights for Employer departed the airport (being Monday, Thursday, and Saturday of every week).

13.     Supr. Abaza further insisted that it was company policy to forbid employees from taking lunch breaks on flight days. There is no regulation or code written in the employee handbook that supports Supr. Abaza's claim. In addition, employees were still forbidden from taking lunch on non-flight days. Supr. Abaza also claimed that "as long as a plane is on the ground, we are losing money," as another reason why employees must work without any breaks.

14.     In or about 2014, Supr. Abaza ordered Plaintiff to wear Employer's uniform. Plaintiff replied that she would, but asked why no other Administrators wore uniforms. Plaintiff also asked if she would be provided the monthly allowance of $60/month to pay for dry cleaning her uniform, as stated in the employee handbook. Supr. Abaza replied that it was a direct order from Mgr. Alehedeb. Since 2014, Plaintiff has worn her uniform, and never been paid the mandatory monthly allowance.

15.     In or about late 2014, Supr. Abaza informed Plaintiff that she had spoken with Mgr. Alehedeb about Plaintiff's uniform. Supr. Abaza had just returned from an Employer conference in Washington, D.C., and informed Mgr. Alehedeb and Mgr. Alhuwaifi that Plaintiff had not been receiving her monthly uniform allowance. Mgr. Alhuwaifi then replied that per Employer's regulation, Admin Coordinators are not eligible to receive this allowance as they are not required to wear uniforms. Even with this information, Mgr. Alehedeb insisted to Supr. Abaza that Plaintiff must wear a uniform. After learning this, Plaintiff continued to wear her uniform for fearing retaliation, including termination, for not doing so.

16.     In or about 2015, Supr. Abaza informed Plaintiff of a time in early 2014 when Mgr. Alehedeb directed Supr. Abaza to terminate Plaintiff. Supr. Abaza replied, "Why? I don't have a good reason to get rid of her." Mgr. Alehedeb then claimed, "She is just not good. Fire her now before her probation ends."

17.     In or about 2018, Plaintiff underwent surgery to have her gall bladder removed. While this was an intense procedure that required several weeks off, Plaintiff was still directed by Supr. Abaza to train a new hire, Operation Agent Brian Jimenez ("Agent B. Jimenez"), how to do invoices. Supr. Abaza called Plaintiff, directing her to train. Plaintiff had already been approved for time off, and Plaintiff reminded Supr. Abaza of this. However, fearing retaliation, Plaintiff agreed to train while in the emergency room awaiting surgery, and soon after her surgery while still recovering in the hospital.

18.     On or about July 1, 2019, Plaintiff was promoted to Senior Admin Coordinator.

19.     On or about March 14, 2020, LAX canceled all outgoing flights for the immediate

future. Plaintiff's department was designated as too important to work from home, and therefore continued to work. Posters and memos were hung around Plaintiff's department, specifying proper COVID-19 procedures. Plaintiff repeatedly complained to Supr. Abaza, approximately twice a week since March 14, 2020, that these safety procedures were not being followed, as Plaintiff had seen co-workers not wearing masks and not sanitize desks after use. Supr. Abaza did not respond to most of Plaintiff's complaints, and on one occasion told Plaintiff, "COVID is a hoax."

20.     Around April, 2020, Plaintiff asked Supr. Abaza if the team could work from home, and only come into the office when needed, as the CTO office was doing. Plaintiff reminded Supr. Abaza of the previous concerns she had raised. Plaintiff added that since there were no flights currently, the team had little work that required to physically be at the airport. Plaintiff explained that if they could copy information from their work laptops onto a USB flash drive, they could work remotely. Supr. Abaza denied this request. When Plaintiff asked for an explanation, Supr. Abaza informed Plaintiff that the County Manager, Marwan Altoumah ("Mgr. Altoumah"), told Supr. Abaza she can run the office however she wants.

21.     In or around 2020, Plaintiff complained to Supr. Abaza that containers of toxic chemicals were being rolled around directly on the floor of their office, and not being carried in their proper equipment. These containers of toxic chemicals had been seized from passengers. Plaintiff also reported that some of these containers were kept in the office permanently, and not disposed of properly. Supr. Abaza replied by vaguely claiming that "We'll have someone clean it out." Plaintiff suggested that they commission World Service West, a janitorial service, to clean up the materials. World Service West is a vendor for Employer, and has provided janitorial services free of charge in the past. Supr. Abaza did not respond to Plaintiff's suggestion.

22.     In or around 2020, Plaintiff was working in the office when she saw an unknown man enter. Plaintiff asked who he was and what he was doing there. The man claimed that one of his friends worked with a vendor, and that friend asked the man to go to the office and retrieve one of the friend's belongings. This vendor had recently concluded business with Employer. Plaintiff asked the friend to leave, and he promptly did so. Later that day, Plaintiff reported the incident to Supr. Abaza. Plaintiff asked Supr. Abaza if they could change the locks every time a vendor stopped doing business with Employer, as it could be a safety hazard to allow anyone to walk into the office. Supr. Abaza claimed she would have someone change the locks. Supr. Abaza never placed an order for this, and the locks remained unchanged until the door broke in August 2020.

23.     In or around 2020, Plaintiff complained that confidential files related to sensitive economic information about Employer's client were not being properly stored. While Plaintiff

properly stored the files she worked with, and properly stored the files she found laying out, Plaintiff asked for assistance from Supr. Abaza in protecting these files. Supr. Abaza replied they were not properly stored because the locks on the file cabinets were broken. Plaintiff asked if Supr. Abaza could speak with higher-ups to fix these cabinets. Supr. Abaza replied she would need to get approval from the Department of Finance (known as the "DFO"), and that she was certain the DFO would refuse this request. Supr. Abaza never did anything further with Plaintiff's complaints.

24.     In or about June of 2021, Plaintiff received an email from Cood. Salah directing Plaintiff to change the number of compensatory hours for employees Operation Agent Mehreteab Zemarian ("Agent Zemarian") and Operation Agent Roberto Aguilar Jimenez ("Agent R. Jimenez"). One of Plaintiff's responsibilities was to review the log-in book at the end of each week. Every employee in Plaintiff's department signed the log-in book when they clocked in and clocked out. The log-in book was located at Plaintiff's desk next to the front door of the office. Cood. Salah directed Plaintiff to remove the hours of overtime the employees had logged, claiming that the employees had "billed too many hours."

25.     Plaintiff refused to do so. Cood. Salah claimed, "They work from 7 A.M. to 4 P.M., but you pay them for a full 8 hours." Plaintiff explained, "They get paid 7 hours plus 1 hour of paid lunch. If they decide to leave at 4 P.M., that's their time, they can do with it what they want. Iman and I count that as them taking lunch and leaving early." Plaintiff added that, "On flight days, they come in 15 minutes early to begin work. Iman and I agree to grant this as overtime, because they start work early to make sure the flight departure goes smoothly."

26.     Plaintiff informed Cood. Salah that Plaintiff believed this to be a labor board violation, and told her, "They aren't given a rest or lunch break, and now you're penalizing them for working?" Cood. Salah replied, "You know I've been working at the airport for a long time, I know the rules." Plaintiff replied, "You work in Washington; Have you ever worked in California in my position? The state of California is very strict about giving employees rest and lunch breaks. Even if an employee were to volunteer not to take lunch, a manager must tell them to take lunch, or send the employee home early. Instead of giving them lunch or letting them go, you want to dock the hours they've worked?"

27.     In or about June 2021, on the Sunday following Plaintiff and Cood. Salah's conversation, Supr. Abaza called Plaintiff. Supr. Abaza informed Plaintiff that Cood. Salah had complained to Supr. Abaza about Plaintiff using inappropriate language and tone during their conversation. Plaintiff replied by explaining she always uses "firm, but appropriate language" when discussing disagreements with colleagues. Plaintiff further explained that she advocated for

her co-workers' rights to overtime, emphasized the importance of Californian labor laws, and warned of the potential consequences for not following those regulations. Plaintiff reminded Supr. Abaza that she was CC'd on this correspondence, and asked Supr. Abaza to review the email chain and alert Plaintiff if Supr. Abaza found any of Plaintiff's language to be inappropriate. Supr. Abaza did not do so.

28.      In or about June of 2021, Cood. Salah called Plaintiff and asked her to audit Supr. Abaza. Cood. Salah specifically alleged that "Iman has a lot of hours and I don't think this is right." Plaintiff, confused, asked, "What do you want me to do?" Cood. Salah replied, "You have all the logs, you can look into it." Plaintiff replied that ordering a lower-ranking employee to audit a higher-up was illegal. Plaintiff replied it was Supr. Abaza's responsibility to audit Plaintiff, therefore, someone above Supr. Abaza should audit Supr. Abaza. Plaintiff added that she does not know Iman's hours before 2014. Plaintiff then explained she felt uncomfortable, as Supr. Abaza was out of the country on leave at the time. Plaintiff suggested that Cood. Salah ask Agent Zemarian to audit Supr. Abaza, as Supr. Abaza had appointed Agent Zemarian as acting supervisor while Supr. Abaza was on leave. Plaintiff then clarified that her only responsibility was to have all the employees log their hours in the attendance book, then submit that book to Supr. Abaza so that she can double-check the hours.

29.      Cood. Salah claimed, "You make the record, you know what to do." Plaintiff responded by emphasizing that she does not make the record or enter hours in for any employees, she just keeps the book they record their hours in. Plaintiff added that Supr. Abaza does not add her hours in until after Plaintiff gives her the record book. Plaintiff then emphasized that with Supr. Abaza away, there is no way to perform a fair audit where Supr. Abaza can defend herself. Plaintiff asked Cood. Salah "Wait until Iman's back, then you can discuss it with her." Plaintiff then messaged Agent Zemarian, asking him to call Cood. Salah to discuss the potential audit.

30.      Later that same day, Plaintiff texted Supr. Abaza to inform her that Cood. Salah requested an audit. Plaintiff then followed up with Agent Zemarian to ask if he called Cood. Salah. Agent Zemarian replied that, "I called Lina, but she never answered my call."

31.      In or around October of 2021, Supr. Abaza asked Plaintiff if she would like to go for a coffee break with Supr. Abaza and co-workers Emily Vasquez and Robert Aguilera. Plaintiff agreed, and during the break, informed Supr. Abaza that Plaintiff noticed Plaintiff's weekly paycheck was about $200 short. Plaintiff informed Supr. Abaza that she had emailed the manager of the DFO, Nahed Osman, about the issue ("Mgr. Osman"), but received no response. Plaintiff then asked Supr. Abaza if Supr. Abaza could provide the number for Human Resources, to which

Supr. Abaza replied, "You can find it yourself."

32.     Later that same day, Plaintiff again approached Supr. Abaza to ask what can be done about her lost wages. Supr. Abaza glared directly at Plaintiff, frightening Plaintiff. Supr. Abaza glared at employees who asked questions she did not like.

33.     On or about January 10, 2022, Plaintiff was finishing a report as a part of her weekly duties. To finish the report, Plaintiff needed to pick up a box containing important paperwork. This box was located on the ground of the office, beneath a stack of other boxes. Each box was incredibly heavily due to the hundreds of papers held within. As Plaintiff began lifting the boxes to retrieve the one at the bottom, she began to feel a strain in her back. As Plaintiff picked up the final box, the strain became an intensely sharp pain focused in the middle of her back. Due do the pressing nature of the report, Plaintiff ignored the pain so she could continue with her duties. This sharp pain continued for the rest of the day. No other employees were present to assist Plaintiff.

34.     In-between January 10 and January 12, 2022, Plaintiff informed Supr. Abaza of her injury from January 10, explaining that as she was moving boxes off the floor, she began to feel pain that become severe once she lifted the final box. Supr. Abaza flippantly told Plaintiff, "Maybe you should see a chiropractor." Plaintiff asked Supr. Abaza for the number of Human Resources so she could report the injury. Supr. Abaza replied, "You can find it yourself."

35.     Supr. Abaza did not refer Plaintiff to a worker's compensation physician, did not ask Plaintiff to fill an incident report, nor communicated Plaintiff's complaint to upper management. According to Employer's policy, if an employee reports an injury, that employee must be sent to Employer's worker's compensation physician to determine if the injury was work-related or not.

36.     On or about January 13, 2022, Plaintiff received a call from a coworker. The coworker informed Plaintiff that at a team meeting, Mgr. Adheleb mentioned that Agent Zemarian had tested positive for COVID-19 two weeks prior. Plaintiff had noticed that Agent Zemarian was displaying symptoms of COVID-19 such as severe coughing. Plaintiff was shocked to learn that not only had Agent Zemarian tested positive, but superiors knew and let him continue working in-person. Plaintiff immediately took a rapid test for COVID-19. Plaintiff tested negative.

37.     On or about January 14, 2022, Plaintiff informed Supr. Abaza she had tested negative for COVID-19. Supr. Abaza asked Plaintiff, "Why did you take a test, it doesn't mean anything? COVID is just another flu. The number of deaths reported is negative. We don't need masks or tests or anything. I took a test and I'm not fucking doing it again." Plaintiff responded that "My father-in-law died this past October from COVID, explain to me how he died if the

numbers are wrong." Supr. Abaza replied, "He had a condition." Plaintiff explained, "That's the point: I have a condition. I am diabetic and have high cholesterol."

38.     On or about January 19, 2022, Plaintiff began feeling symptoms of COVID-19, including severe coughing, severe headache, and fatigue. Plaintiff went to her primary care physician's office to take a polymerase chain reaction test, or PCR test, for COVID. Plaintiff's physician informed her that while she had symptoms of COVID-19 but did not have the test results, she had to stay off work. Plaintiff's physician prescribed Plaintiff with time off work for three days, until the test results come back on January 24, 2022.

39.     On or about January 24, 2022, Plaintiff tested negative for COVID-19 and returned to work the following day.

40.     Beginning on or about January 25, 2022, and continuing until Plaintiff's termination, Plaintiff began wearing a heat pad around her back to deal with the intense pain she felt. This pack was worn over Plaintiff's clothes, and was bright yellow in color. This made it plain to see for all who worked near Plaintiff.

41.     Later that same day, Supr. Abaza approached Plaintiff, and asked why she was wearing the heat pad. Plaintiff explained that it was to manager her pain, reminding Supr. Abaza of the January 12 injury. Plaintiff showed the pack to her and explained that "I have to sit with this against my back for my pain."

42.     On or about February 4, 2022, Plaintiff texted Supr. Abaza that "I am having fever, severe back pain and my blood pressure is rising. I am taking emergency pills [referring to Tylenol] from my doctor and try to rest. I won't be able to come today. I will update." Supr. Abaza respond, "That's too bad, but we need some info from you. Mehretab txt you, pls answer him if ur able [sic]." Despite feeling severely sick, and instructed by her physician to rest, Plaintiff assisted Agent Zemarian for fear of retaliation if she did not.

43.     On or about February 7, 2022, Plaintiff visited her chiropractor. Plaintiff's chiropractor prescribed Plaintiff with eleven days off work, from February 7, 2022, to February 18, 2022. Plaintiff's chiropractor ordered Plaintiff to rest, and scheduled a follow-up appointment for February 11, 2022, for an X-Ray. Plaintiff's physician recommended Plaintiff take Advil to manage the pain.

44.     On or about February 11, 2022, Plaintiff had her X-Ray. This formally diagnosed Plaintiff with retrolisthesis of L3 and L4 (in which the L3 and L4 vertebrae in her lower back slipped backward on one another, causing severe back and leg pain), osteophytes (also known as "bone spurs") (largest on the right and L3-4), and disc narrowing on L4-L5 (building-up pressure

along Plaintiff's entire spine). Plaintiff's chiropractor set a follow-up appointment for February 17, 2022, and extended Plaintiff's time off.

45.    On or about February 17, 2022, Plaintiff visited her chiropractor for her follow-up appointment. Plaintiff's chiropractor determined that Plaintiff was not well enough to return to work and ordered her to remain off work until March 31, 2022. Plaintiff's chiropractor also referred that Plaintiff see Dr. Robert Washington, an internal medicine specialist ("Dr. Washington"), so that Dr. Washington could perform an MRI.

46.    On or about February 23, 2022, Plaintiff sent the medical certification to Supr. Abaza through text.

47.    On or about March 31, 2022, Plaintiff visited Dr. Washington. Dr. Washington took Plaintiff's blood pressure, and found that it was severely high: 160/100 bp, much higher than the typical average of 120/80. During the appointment, Dr. Washington began the process to get approval from Plaintiff's insurance for the MRI. Dr. Washington extended Plaintiff's time off until April 14, 2022, 2022. Plaintiff's husband handed this medical certification to Supr. Abaza the following day.

48.    On or about April 14, 2022, Plaintiff had her follow-up appointment. Dr. Washington informed Plaintiff her MRI was set for May 2, 2022, and extended Plaintiff's time off until May 19, 2022. Plaintiff texted this medical certification to Supr. Abaza that same day.

49.    On or about May 2, 2022, Plaintiff had her MRI. Dr. Washington prescribed Plaintiff with additional time off work, until May 19, to begin new treatment based on the results. Plaintiff's husband turned in the medical certification the following day. Dr. Washington scheduled a follow-up appointment for May 19, 2022.

50.    On or about May 9, 2022, Cood. Salah emailed Plaintiff, claiming that Plaintiff had utilized all her Illness Protection Benefit (also known as "IPB") days. Cood. Salah alleged that Plaintiff used 67 IPB days in 2021, and 1 IPB day in 2022, meaning that Plaintiff would run out of IPB days on May 12, 2022. This email contained a chart, which allegedly broke down month-by-month when and how Plaintiff used her IPB days.

51.    On or about May 10, 2022, Cood. Salah emailed Plaintiff again, claiming that "The company has reviewed its policies and determined that you do not have available to you additional sick leave or similar benefits to cover the medical time off request provided by your doctor through May 19th [sic]." Cood. Salah then alleged that "The company can no longer hold your position open indefinitely," and directed Plaintiff to turn in medical certification clearing Plaintiff to return to work by May 20, 2022. Cood. Salah also informed Plaintiff in this email that Employer would

use Plaintiff's vacation days for any time Plaintiff took off in-between May 10, 2022, and May 23, 2022. Plaintiff was not able to send this certification, as she would not know the results of her MRI, and her corresponding ability to work, until May 19, 2022. Further, Plaintiff did not receive this email.

52.     On or about May 18, 2022, Plaintiff replied to Cood. Salah's email, and asked for Cood. Salah to confirm that Cood. Salah worked for Human Resources.

53.     On or about May 19, 2022, Plaintiff had her follow-up appointment. Dr. Washington found that Plaintiff's blood pressure was 160/100 bp, much higher than the typical average of 120/80. Dr. Washington also recorded that Plaintiff's symptoms, particularly her intense pain in her back, had not subsided. Plaintiff was prescribed with additional time-off work until August 19, 2022.

54.     Later that same day, Plaintiff emailed Supr. Abaza to inform Supr. Abaza that Plaintiff's husband will turn in the medical certification to Supr. Abaza the following day. Supr. Abaza asked for Plaintiff's husband to come in at 10 a.m. the next day.

55.     Later that same day, Plaintiff received an email from Cood. Salah, claiming that if Plaintiff did not turn in the medical certification on May 20, 2022, Plaintiff would be terminated effective May 23, 2022. Cood. Salah then claimed that the original May 10, 2022 notice was sent by HR. Cood. Salah further claimed that she does not directly work for HR, but is the "designated representative and administrator under Mgr. Alehedeb." Plaintiff assured Cood. Salah that Plaintiff was doing all she could in light of her medical condition, and that she had been unable to reach Supr. Abaza to give her the medical certification. Plaintiff then said that she did not receive the email from May 10, 2022, and she would not have even be able to inform Cood. Salah if she could return on May 20, 2022, as her results would not come in until May 19, 2022. Plaintiff then informed Cood. Salah that she received the results of her MRI, and was put off work until August 19, 2022.

56.     On or about May 20, 2022, Plaintiff's husband visited Supr. Abaza's office at 10 a.m., only to find Supr. Abaza was absent. Plaintiff called Supr. Abaza, who informed Plaintiff that Supr. Abaza was ordered to work from home that day. Plaintiff then texted the medical certification to Supr. Abaza.

57.     On or about May 22, 2022, Plaintiff emailed Cood. Salah and stated that Plaintiff did not agree to using her vacation days. Plaintiff reminded Cood. Salah that according to section 8.4 on page 31 of the employee handbook, employees received 12 sick days at the start of every year. Plaintiff further explained that 3 of the sick days Plaintiff took off, from January 21 to 25, 2022,

were due to a possible COVID-19 infection. As such, these 3 sick days should be reinstated under the "2022 COVID-19 Supplemental Paid Sick Leave" state law, extended through September 30, 2022. Plaintiff also raised a variety of issues, such as how often she worked from home unpaid, including training Agent B. Jimenez and assisting Agent Zemarian while she was sick. Plaintiff also emphasized the fact that she never received her monthly uniform allowance.

58.     On or about May 26, 2022, Cood. Salah emailed Plaintiff, alleging that Plaintiff had used 68 IPB days, exceeding the limit of 60 days. Cood. Salah agreed that Plaintiff's three days off in January 2022 were able to be reinstated under the state law, and as such Plaintiff had a total of 12 sick days remaining. Cood. Salah claimed that Employer would only be able to hold Plaintiff's position open until June 16, 2022. Cood. Salah threatened that unless Plaintiff was cleared to return to work by then, Plaintiff would be terminated on June 17, 2022.

59.     On or about May 27, 2022, Plaintiff replied that she would like to use her 38 hours of unused compensatory time to cover four days off work until June 3, 2022. Plaintiff then asked to use her 12.825 vacation days to cover until June 22, 2022.

60.     On or about May 31, 2022, Cood. Salah replied that Plaintiff was expected to return June 23, 2022. Cood. Salah then threatened that while Plaintiff was on medical leave until August 19, 2022, Plaintiff would be terminated if she did not return on June 24, 2022.

61.     On or about June 8, 2022, Plaintiff sent Cood. Salah an email notifying Cood. Salah asking for any mail to be forwarded to Plaintiff's in-law's home, and provided the address.

62.     On or about June 24, 2022, Plaintiff received an email from Cood. Salah containing her termination letter, effective June 23, 2022. In this same email, Cood. Salah claimed that Plaintiff would receive her final check via FedEx that afternoon. Plaintiff did not receive her check.

63.     On or about June 28, 2022, Plaintiff received the mailed termination letter. Plaintiff sent an email to Cood. Salah informing her that Plaintiff did not receive her check, and sent her in-law's address again. Cood. Salah replied by alleging that the check was sent on June 24, 2022 and had been delayed. Plaintiff then replied, asking if this final check would cover vacation days Plaintiff used to cover her final days off (specifically, June 16, 2022 to June 22, 2022). Plaintiff also said that if she did not receive the check that day, she would file a complaint with the California Labor Board. Plaintiff did not receive a response to this email.

64.     On or about June 29, 2022, Plaintiff filed a complaint with the California Labor Board regarding the unpaid final check. In addition, Plaintiff did not receive the severance package

of 6 months' salary that all Senior Admin Coordinators are given upon termination. At the time of this writing, Plaintiff has still not been paid for her final check nor given the severance pay.

65.     In or about July 2022, a coworker informed Plaintiff that Mgr. Alehedeb wanted to terminate Plaintiff. The coworker explained that Supr. Abaza relayed to the coworker that Supr. Abaza asked if Mgr. Alehedeb would hire a new Senior Admin Coordinator to replace Plaintiff. Mgr. Alehedeb stated that he would not, as he "hated" Plaintiff to such a degree that he did not even want to replace her position. Mgr. Alehedeb also told Supr. Abaza that he sought to terminate Plaintiff for a period of time. The coworker also told Plaintiff that when Mgr. Alehedeb returned from leave in December 2021, Mgr. Alehedeb told the coworker personally that, "I'm going to get rid of Jennie [a nickname for Plaintiff]. I don't like her, I tried to get rid of her numerous times before, but I couldn't. Now I will get rid of her for sure."

66.     On information and belief, Operation Agent Lena Azadi ("Agent Azadi"), a female co-worker in her 30s, was given the severance package.

67.     On information and belief, Operation Agent Lindsay Phillips, ("Agent Phillips"), a female co-worker in her 30s, was promoted to Sales Executive shortly after Plaintiff's termination.

68.     During the period of Plaintiff's employment with Employer, Plaintiff had, and/or was perceived by Employer as having and/or likely to have disabilities in the future.  These disabilities included but are not limited to diabetes, COVID-19 symptoms, retrolisthesis, osteophytes (also known as "bone spurs"), disc narrowing and related physical symptoms, including severe pain, greatly restricted mobility and severe weakness in the affected parts of the body, and/or other named symptom and related symptoms, conditions and limitations. Plaintiff's disabilities did and/or were regarded by Employer as interfering with and limiting Plaintiff's major life activities, including ability to work. Plaintiff's disabilities required reasonable accommodations, including but not limited to periodic time off work for medical treatment and recuperation from flare ups of symptoms, workplace accommodations. Employer failed and refused to provide reasonable accommodations for Plaintiff's disabilities.

69.     At all relevant times, Plaintiff was qualified for Plaintiff's job position with Employer, and could perform all essential functions of Plaintiff's job, and of reasonably available alternative positions of Employer, with reasonable accommodations, without unreasonably endangering Plaintiff's or anyone else's health or safety.

70.     In or about February 2022, Plaintiff took approximately 4 months of medical leave from work for a serious medical condition that limited Plaintiff's ability to work. Employer failed and refused to engage in a timely good faith interactive process with Plaintiff to identify and

provide reasonable accommodations. Employer discouraged Plaintiff from taking time off work for medical appointments and/or flare-ups in symptoms. Employer failed and refused to provide reasonable accommodations for Plaintiff's disabilities.

71.     In or about March 2014 through June 2022, Plaintiff reported to supervisors, including Supr. Abaza, and/or refused to participate in, Employer's violation of laws and regulations prohibiting discrimination, retaliation, harassment, including Cal. Govt. Code 12940, 12945, 12945.2; Cal. Const. Art. I, Section 8; Cal. Lab. Code including 512, and workplace safety laws including Cal-OSHA. Employer retaliated against Plaintiff's whistleblower activities including by terminating Plaintiff.

72.     Employer was substantially motivated to and did discriminate and retaliate against Plaintiff, including terminating Plaintiff, based upon Plaintiff's protected classes, and Plaintiff's attempts to and exercise of Plaintiff's right to disability and medical leave, and retaliated against Plaintiff's opposition to harassment, discrimination and retaliation.

73.     As the proximate result of Defendant's wrongful conduct, Plaintiff has and will suffer past and future lost wages and benefits in an amount to be determined by the trier of fact, but estimated to be no less than $300,000, and past and future emotional distress and mental suffering estimated to be no less than $300,000.

74.     Los Angeles Station Supervisor Iman (also spelt "Eman") Abaza ("Supr. Abaza"), SAUDI ARABIAN AIRLINES CORPORATION dba SAUDIA Country Manager for the United States Khalid Alehedeb ("Mgr. Alehedeb"), Saudia Arabian Airlines Corporation Operation Manager for the United States Bassam Alsadoon ("Mgr. Alsadoon"), Senior Administrative Coordinator Lina Salah ("Cood. Salah") are managing agents of Employer because on information and belief Employer allowed them to exercise largely unfettered discretion to participate in, authorize and ratify, and to determine whether and how to investigate and discipline evidence of, discrimination, retaliation and harassment and other legal compliance, including but not limited to labor laws, OSHA and their industry's regulations. Employer allowed them to exercise largely unfettered discretion to determine whether and how to enforce legal requirements. These individuals had the discretion to make highly influential hiring and firing recommendations, and manage, supervise, evaluate and discipline other managers, and enter into binding agreements on behalf of Employer. They participated in, authorized and/or ratified the discriminatory, retaliatory and unlawful adverse employment actions against Plaintiff and others.

**IV.**

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICIES**

**Common Law Tort**

**By Plaintiff against Employer**

75.      Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

76.      Employer discharged Plaintiff in violation of important and well-established public policies, set forth in various statutes and Constitutional provisions including but not limited to Government Code § 12940, see §§ 12920 and 12926 (employment discrimination and retaliation); Cal. Const. Art. I, § 8 (employment discrimination); Govt. Code §§ 12945.2 (medical leave discrimination and retaliation), Labor Code § 512 (failure to provide lunch breaks), California Bus. & Prof. Code §17200 (unfair business practices), Labor Code § 226.7 (failure to provide rest breaks), Labor Code § 218.5.

77.      Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.

78.      Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

**SECOND CAUSE OF ACTION**

**MEDICAL LEAVE RETALIATION**

**Govt. Code § 12945.2 (CFRA)**

**By Plaintiff against Employer**

79.      Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

80.      On information and belief, Employer has more than 5 employees where Plaintiff worked and Plaintiff had worked for Employer for over 12 months and had worked over 1250 hours in the 12 months preceding Plaintiff's use of medical leave. Plaintiff had a serious medical condition requiring that she periodically take time of work.

81.      Employer took adverse employment actions against Plaintiff in retaliation for Plaintiff's attempts to and exercise of Plaintiff's rights to medical leave under Govt. Code §

12945.2, and in retaliation for Plaintiff's opposition to Employer's interference with Plaintiff's rights.  Employer's retaliation violated Govt. Code § 12945.2, including subsection (l).

82.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

83.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

**THIRD CAUSE OF ACTION**

**MEDICAL LEAVE DISCRIMINATION**

**Govt. Code § 12945.2 (CFRA)**

**By Plaintiff against Employer**

84.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

85.     On information and belief, Employer has more than 5 employees within 75 miles of where Plaintiff worked and Plaintiff had worked for Employer for over 12 months and had worked over 1250 hours in the 12 months preceding Plaintiff's use of medical leave.

86.     On information and belief, Employer discouraged Plaintiff from taking and denied Plaintiff medical leave from work in violation of Govt. Code § 12945.2, in part by terminating Plaintiff's employment to prevent Plaintiff from taking medical leave from work in the future.

87.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

88.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

COMPLAINT

**FOURTH CAUSE OF ACTION**

**RETALIATION FOR REQUESTING AND USING ACCOMMODATIONS FOR DISABILITIES**

**Govt. Code § 12940(m)**

**By Plaintiff against Employer**

89.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

90.     Employer retaliated against Plaintiff for requesting and using accommodations for her disabilities, including time off work for flareups in symptoms, surgery, and treatment. Employer's conduct violated Govt. Code § 12940, including subsection (m).

91.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

92.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

**FIFTH CAUSE OF ACTION**

**FAILURE TO ENGAGE IN A TIMELY, GOOD FAITH, INTERACTIVE PROCESS TO DETERMINE REASONABLE ACCOMMODATION FOR DISABILITY**

**Govt. Code § 12940(n)**

**By Plaintiff against Employer**

93.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

94.     Employer failed to engage in a timely, good faith, interactive process with Plaintiff to determine effective reasonable accommodations for Plaintiff's disabilities. Employer discouraged Plaintiff from taking further leave.  This violated Govt. Code § 12940, including subsection (n).

95.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

96.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

## SIXTH CAUSE OF ACTION

### FAILURE TO REASONABLY ACCOMMODATE DISABILITIES

### Govt. Code § 12940(m)

### By Plaintiff against Employer

97.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

98.     Plaintiff is a member of a class protected from disability discrimination, those having or perceived to have diabetes, symptoms of COVID-19, retrolisthesis of L3 and L4 (in which the L3 and L4 vertebrae in her lower back slipped backward on one another, causing severe back and leg pain), osteophytes (also known as "bone spurs") (largest on the right and L3-4), and disc narrowing on L4-L5 (building-up pressure along Plaintiff's entire spine) and related conditions and symptoms. Plaintiff's disabilities required reasonable accommodations, including but not limited to disability leave and medical evaluation and treatment, sometimes during working hours.

99.     Employer failed to make reasonable accommodations for the disabilities of Plaintiff. Employer tried to intimidate Plaintiff to prevent Plaintiff from requesting further accommodations. This violated Govt. Code § 12940, including subsection (m).

100.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

101.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

## SEVENTH CAUSE OF ACTION

### DISABILITY DISCRIMINATION

### Govt. Code § 12940(a)

### By Plaintiff against Employer

102.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs

above that precede the title block for the "First Cause of Action."

103.     Plaintiff is a member of a class protected from disability discrimination, those having or perceived to have current or future disabilities, including but not limited to symptoms of diabetes, COVID-19, retrolisthesis of L3 and L4 (in which the L3 and L4 vertebrae in her lower back slipped backward on one another, causing severe back and leg pain), osteophytes (also known as "bone spurs") (largest on the right and L3-4), and disc narrowing on L4-L5 (building-up pressure along Plaintiff's entire spine) and related conditions and symptoms requiring disability leave and medical evaluation and treatment, sometimes during working hours.

104.     Employer took adverse employment actions against Plaintiff, including termination, that were substantially motivated by Plaintiff's protected class.  This violated Govt. Code 12940, including subsection (a).

105.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

106.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

### EIGHTH CAUSE OF ACTION

### RETALIATION FOR OPPOSING VIOLATIONS OF FEHA (Govt. Code § 12900, et seq.)

### Govt. Code § 12940(h)

### By Plaintiff against Employer

107.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

108.     Employer took adverse employment actions against Plaintiff substantially motivated by, and in retaliation for, Plaintiff's opposition to Employer's violation of FEHA, Govt. Code §§ 12900-12996, including Govt. Code §§ 12940 (discrimination), 12945.2 (family/medical leave); see Govt. Code 12920, 12926.  Employer's retaliation violated Govt. Code § 12940, including subsection (h).

109.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including

under Govt. Code § 12965.

110.    Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

**NINTH CAUSE OF ACTION**

**FAILURE TO PREVENT AND STOP HARASSMENT, DISCRIMINATION AND RETALIATION**

**Govt. Code § 12940(j), (k)**

**By Plaintiff against Employer**

111.    Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

112.    Employer knew or reasonably should have known of the harassment, discrimination and retaliation against Plaintiff.  Employer failed to take all reasonable steps to prevent these from occurring to Plaintiff, including but not limited to failing to take complaints seriously, failing to timely and thoroughly investigate and document evidence of harassment, discrimination and retaliation, failing to report the results of its investigation to Plaintiff, and failing to take timely and appropriate corrective and preventive action to stop the harassment, discrimination and retaliation. This violated Govt. Code § 12940, including subsections (j) and (k).

113.    Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

114.    Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

**TENTH CAUSE OF ACTION**

**WHISTLEBLOWER RETALIATION**

**Labor Code §§ 1102.5 & 1102.6**

**By Plaintiff against Employer**

115.    Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

116.    Plaintiff reported to supervisors, and refused to participate in, Employer's activities that Plaintiff reasonably believed, would result in a violation of, or noncompliance with, state or federal regulations, statutes or Constitutional provisions, including but not limited to Cal. Govt. Code 12940, 12945.2, Cal. Labor Code, and workplace safety laws including Cal-OSHA.

117.    Employer was substantially motivated to, and did, take adverse employment actions against Plaintiff in retaliation for Plaintiff's protected activities, in violation of Labor Code §§ 1102.5 & 1102.6.

118.    Defendant's wrongful conduct proximately caused Plaintiff to suffer general, special and statutory damages in an amount to be proven, and $10,000 per violation under CC § 1102.5. Plaintiff has been required to hire attorneys, including Geoffrey Lyon of Lyon Law, and is entitled to recover reasonable attorneys' fees.  Plaintiff is entitled to injunctive relief including reinstatement and back pay and promotion without discrimination or retaliation.

119.    Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

## ELEVENTH CAUSE OF ACTION
## FAILURE TO PROVIDE MEAL PERIODS
### Labor Code § 512
### (By Plaintiff against Employer)

120.    Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

121.    Labor Code § 512 requires employers to provide non-exempt employees who work five (5) or more hours per-day with one thirty (30) minute unpaid meal period for every four (4) hours of work.

122.    Plaintiff was a non-exempt employee who worked more than 5 hours per day for employer and was therefore entitled to a 30-minute meal break under Labor Code § 512. At no time during Plaintiff's employment with Employer did Employer provide Plaintiff with Plaintiff's legally required meal period or advise Plaintiff of Plaintiff's right thereto.

123.    Employer's wrongful conduct proximately caused Plaintiff to suffer general, special and statutory damages, in an amount to be proven.

124.    Under Labor Code section 226.7(a) Employer must reimburse Plaintiff one hour's pay for each meal period that Plaintiff was forced to work through.

-21-
COMPLAINT

125.     Under Labor Code section 218.5 Plaintiff is entitled to an award of reasonable attorney's fees and costs.  Plaintiff has been required to hire attorney Geoffrey Lyon of Lyon Law, PC and has incurred an obligation for reasonable attorney's fees.

126.     The conduct described in this Cause of Action constitutes an unfair business practice pursuant to the California Bus. & Prof. Code §17200 et seq.  Therefore, Plaintiff is entitled to any and all equitable relief that this court deems just and proper.

**TWELFTH CAUSE OF ACTION**

**FAILURE TO PROVIDE RESTBREAKS**

**Labor Code § 226.7(d)**

**(By Plaintiff against Employer.)**

127.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

128.     The California Industrial Welfare Commission ("IWC") has promulgated Wage Orders requiring employers to provide non-exempt employees with 10-minute paid rest periods for every 4-hour work period. Plaintiff was not an exempt employee, yet at no time during Plaintiff' employment was Plaintiff advised by Defendant Employer and/or Employer's agents about Plaintiff's right to take a 10-minute paid rest break for every four hours of scheduled work, nor was Plaintiff provided with such a break.

129.     Employer authorized, knew of, and willfully failed to provide Plaintiff with her legally mandated rest breaks because such misconduct was committed by its managing agents.

130.     Employer's wrongful conduct proximately caused Plaintiff to suffer general, special and statutory damages in an amount to be proven.

131.     Pursuant to Labor Code section 226.7(d), Employer is obligated pay Plaintiff one additional hour of pay at Plaintiff's regular rate of compensation for each work day that Plaintiff was not provided with the rest period as mandated by the IWC.

132.     Pursuant to Labor Code section 218.5 Plaintiff is entitled to an award of reasonable attorney's fees and costs.  Plaintiff has been required to hire attorney Geoffrey Lyon of Lyon Law, PC and has incurred an obligation for reasonable attorney's fees.

133.     The conduct described in this Cause of Action constitutes an unfair business practice pursuant to the California Bus. & Prof. Code §17200 et seq.  Therefore, Plaintiff is entitled to any and all equitable relief that this court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**

**DISCRIMINATION BASED ON AGE – DISPARATE TREATMENT**

COMPLAINT

**Govt. Code § 12940**

**By Plaintiff against Employer**

134.     Plaintiff realleges and incorporates in this cause of action all numbered paragraphs above that precede the title block for the "First Cause of Action."

135.     Employer took adverse employment actions against Plaintiff substantially motivated by Plaintiff's age. Employer's discrimination and disparate treatment violated Govt. Code § 12940, including subsection (a).

136.     Employer's wrongful conduct proximately caused Plaintiff to suffer general and special damages in an amount to be proven.  Plaintiff has been required to hire attorneys, including Geoffrey Lyon, of Lyon Law PC, and is entitled to recover reasonable attorneys' fees, including under Govt. Code § 12965.

137.     Employer's wrongful conduct was malicious, oppressive, fraudulent, despicable, not to be tolerated by civilized society, and was known, authorized, ratified and/or perpetrated by its officers, directors or managing agents, entitling Plaintiff to an award of punitive and exemplary damages, including under Civil Code § 3294, in an amount to be proven.

**V.**

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays for relief on Plaintiff's causes of action as more specifically set forth in the individual causes of action:

1.   For economic damages, including past and future lost wages and medical expenses, in an amount to be proven, but estimated to be no less than $300,000;

2.   For non-economic damages, including for past and future emotional distress, in an amount to be proven, but estimated to be no less than $300,000;

3.   For punitive and exemplary damages, including under Civil Code § 3294, in and amount to be proven;

4.   For statutory damages and penalties, including under Labor Code § 1102.5;

5.   For injunctive relief;

6.   For prejudgment interest;

7.   For costs of suit, including under CCP 1033.5, in an amount to be proven;

///
///
///

8.   For reasonable attorneys' fees, including litigation assistant fees, including under Govt. Code § 12965, in an amount to be proven;

9.   For such other and further relief as the court deems just and proper.

DATED:  November 11, 2022                    LYON LAW PC

Geoffrey C. Lyon
Attorney for Plaintiff,
THUHONG DO

COMPLAINT

# VI.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues in this action triable by a jury, including but not limited to issues of liability and damages.

DATED:  November 11, 2022                    LYON LAW PC


                                             Geoffrey C. Lyon
                                             Attorney for Plaintiff,
                                             THUHONG DO

COMPLAINT

# EXHIBIT 1



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

**Civil Rights Department**                                                              KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@dfeh.ca.gov

November 11, 2022


Geoffrey Lyon
Lyon Law; 3605 Long Beach Blvd, Ste 311
Long Beach, CA 90807

RE:    **Notice to Complainant's Attorney**
       CRD Matter Number: 202210-18651124
       Right to Sue: DO / SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA

Dear Geoffrey Lyon:

Attached is a copy of your complaint of discrimination filed with the Civil Rights
Department (CRD) pursuant to the California Fair Employment and Housing Act,
Government Code section 12900 et seq. Also attached is a copy of your Notice of Case
Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 10/22)

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency          GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@dfeh.ca.gov

November 11, 2022

RE:   **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202210-18651124
Right to Sue: DO / SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD)) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Pilot Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Government Code section 12945.2, has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation.  The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@dfeh.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

CRD - ENF 80 RS (Revised 10/22)



STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@dfeh.ca.gov

Civil Rights Department



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@dfeh.ca.gov

November 11, 2022

THUHONG DO
132 Honors Course Dr.
Las Vegas, NV 89148

RE:     **Notice of Case Closure and Right to Sue**
        CRD Matter Number: 202210-18651124
        Right to Sue: DO / SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA

Dear THUHONG DO:

This letter informs you that the above-referenced complaint filed with the Civil Rights
Department (CRD) has been closed effective November 11, 2022 because an
immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Pilot
Program. Under this program, established under Government Code section
12945.21, a small employer with 5 -19 employees, charged with violation of the
California Family Rights Act, Government Code section 12945.2, has the right to
participate in CRD's free mediation program. Under this program both the
employee requesting an immediate right to sue and the employer charged with
the violation may request that all parties participate in CRD's free mediation
program. The employee is required to contact the Department's Dispute
Resolution Division prior to filing a civil action and must also indicate whether
they are requesting mediation. The employee is prohibited from filing a civil
action unless the Department does not initiate mediation within the time period
specified in section 12945.21, subdivision (b) (4), or until the mediation is
complete or is unsuccessful. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled
from the date the employee contacts the Department regarding the intent to
pursue legal action until the mediation is complete or is unsuccessful. Contact
CRD's Small Employer Family Leave Mediation Pilot Program by emailing



STATE OF CALIFORNIA  |  Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@dfeh.ca.gov

DRDOnlinerequests@dfeh.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Civil Rights Department

## COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**

THUHONG DO

CRD No. 202210-18651124

Complainant,

vs.

SAUDI ARABIAN AIRLINES CORPORATION DBA
SAUDIA
380 World Way, Suite 3430
Los Angeles, CA 90045

Respondents

---

**1.** Respondent **SAUDI ARABIAN AIRLINES CORPORATION DBA SAUDIA** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **THUHONG DO**, resides in the City of **Las Vegas,** State of **NV.**

**3**. Complainant alleges that on or about **June 29, 2022**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's race, ancestry, national origin (includes language restrictions), color, genetic information or characteristic, disability (physical or mental), medical condition (cancer or genetic characteristic), age (40 and over), other, association with a member of a protected class, family care or medical leave (cfra).

**Complainant was discriminated against** because of complainant's race, ancestry, national origin (includes language restrictions), color, genetic information or characteristic, disability (physical or mental), medical condition (cancer or genetic characteristic), age (40 and over), other, association with a member of a protected class, family care or medical leave (cfra) and as a result of the discrimination was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, denied equal pay, suspended, demoted, asked impermissible non-job-related questions, denied any employment benefit or privilege, denied

-1-
*Complaint – CRD No. 202210-18651124*

Date Filed: November 11, 2022

CRD-ENF 80 RS (Revised 10/22)

reasonable accommodation for a disability, other, denied work opportunities or assignments, denied or forced to transfer, denied family care or medical leave (cfra).

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, participated as a witness in a discrimination or harassment complaint, requested or used family care or medical leave (cfra) and as a result was terminated, laid off, forced to quit, denied hire or promotion, reprimanded, denied equal pay, suspended, demoted, asked impermissible non-job-related questions, denied any employment benefit or privilege, denied reasonable accommodation for a disability, other, denied work opportunities or assignments, denied or forced to transfer, denied family care or medical leave (cfra).

**Additional Complaint Details:** See attached allegations.

-2-
*Complaint – CRD No. 202210-18651124*

Date Filed: November 11, 2022

CRD-ENF 80 RS (Revised 10/22)

1

VERIFICATION

2

I, **Geoffrey C. Lyon**, am the **Attorney** in the above-entitled complaint.  I have read
the foregoing complaint and know the contents thereof.  The matters alleged are
based on information and belief, which I believe to be true.

3

4

On November 11, 2022, I declare under penalty of perjury under the laws of the State
of California that the foregoing is true and correct.

5

6

**Long Beach, CA**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-3-

*Complaint – CRD No. 202210-18651124*

27

Date Filed: November 11, 2022

28

CRD-ENF 80 RS (Revised 10/22)

**GENERAL ALLEGATIONS**

1.      Plaintiff ThuHong Do ("Plaintiff") was employed by Defendant SAUDI ARABIAN AIRLINES CORPORATION dba SAUDIA ("Employer") on or about March 1, 2014, through Plaintiff's termination on or about June 24, 2022. Plaintiff worked in the Operations Department at Employer's station at Los Angeles International Airport 380 World Way, Suite 3430 Los Angeles, CA 90045. Plaintiff's job title was "Senior Admin Coordinator." Plaintiff worked under immediate supervisor Los Angeles Station Supervisor Iman (also spelt "Eman") Abaza ("Supr. Abaza"), Country Manager for the United States Khalid Alehedeb ("Mgr. Alehedeb"), Saudia Arabian Airlines Corporation Operation Manager for the United States Bassam Alsadoon ("Mgr. Alsadoon"), Senior Administrative Coordinator Lina Salah ("Cood. Salah"), and General Manager Abdullah Alhuwaifi ("Mgr. Alhuwaifi"). Plaintiff handled daily communications between Employer and the authority for Los Angeles International Airport. Plaintiff also handled all billing for the Employer's vendors and Employer, reporting any complaints from vendors to upper management. At all relevant times, Plaintiff performed Plaintiff's duties competently and satisfactorily, and Employer's stated reasons for termination of Plaintiff's employment were pretexts for unlawful discrimination and retaliation.

2.      Beginning in or about March 2014, and continuing until Plaintiff's termination, Plaintiff and other co-workers were denied their regularly scheduled 1-hour long lunch break. Plaintiff was forced to work from 9 am to 5 pm daily with no lunch breaks or other opportunities to rest. In addition, Plaintiff's role necessitated that she sat in her chair with little opportunity to move for most of the day. With no lunch or other breaks, Plaintiff's ability to move was severely limited while working.

3.      Plaintiff complained to Supr. Abaza and pointed out that lunch breaks are guaranteed under the Benefits section of the Employee handbook. In response, Supr. Abaza claimed she did provide lunch breaks. Supr. Abaza was referring to occasions when she asked individual employees if they wanted to get coffee with her. Supr. Abaza asked employees to accompany her randomly, with no adherence to regulation. Plaintiff responded to Supr. Abaza by explaining that it was unacceptable according to state regulation to not provide regular lunch breaks. Supr. Abaza claimed that regularly scheduled lunch breaks would be bad for business, especially on "flight days." These days are when major flights for Employer departed the airport (being Monday, Thursday, and Saturday of every week).

4.      Supr. Abaza further insisted that it was company policy to forbid employees from

taking lunch breaks on flight days. There is no regulation or code written in the employee handbook that supports Supr. Abaza's claim. In addition, employees were still forbidden from taking lunch on non-flight days. Supr. Abaza also claimed that "as long as a plane is on the ground, we are losing money," as another reason why employees must work without any breaks.

5.      In or about 2014, Supr. Abaza ordered Plaintiff to wear Employer's uniform. Plaintiff replied that she would, but asked why no other Administrators wore uniforms. Plaintiff also asked if she would be provided the monthly allowance of $60/month to pay for dry cleaning her uniform, as stated in the employee handbook. Supr. Abaza replied that it was a direct order from Mgr. Alehedeb. Since 2014, Plaintiff has worn her uniform, and never been paid the mandatory monthly allowance.

6.      In or about late 2014, Supr. Abaza informed Plaintiff that she had spoken with Mgr. Alehedeb about Plaintiff's uniform. Supr. Abaza had just returned from an Employer conference in Washington, D.C., and informed Mgr. Alehedeb and Mgr. Alhuwaifi that Plaintiff had not been receiving her monthly uniform allowance. Mgr. Alhuwaifi then replied that per Employer's regulation, Admin Coordinators are not eligible to receive this allowance as they are not required to wear uniforms. Even with this information, Mgr. Alehedeb insisted to Supr. Abaza that Plaintiff must wear a uniform. After learning this, Plaintiff continued to wear her uniform for fearing retaliation, including termination, for not doing so.

7.      In or about 2015, Supr. Abaza informed Plaintiff of a time in early 2014 when Mgr. Alehedeb directed Supr. Abaza to terminate Plaintiff. Supr. Abaza replied, "Why? I don't have a good reason to get rid of her." Mgr. Alehedeb then claimed, "She is just not good. Fire her now before her probation ends."

8.      In or about 2018, Plaintiff underwent surgery to have her gall bladder removed. While this was an intense procedure that required several weeks off, Plaintiff was still directed by Supr. Abaza to train a new hire, Operation Agent Brian Jimenez ("Agent B. Jimenez"), how to do invoices. Supr. Abaza called Plaintiff, directing her to train. Plaintiff had already been approved for time off, and Plaintiff reminded Supr. Abaza of this. However, fearing retaliation, Plaintiff agreed to train while in the emergency room awaiting surgery, and soon after her surgery while still recovering in the hospital.

9.      On or about July 1, 2019, Plaintiff was promoted to Senior Admin Coordinator.

10.     On or about March 14, 2020, LAX canceled all outgoing flights for the immediate future. Plaintiff's department was designated as too important to work from home, and therefore

continued to work. Posters and memos were hung around Plaintiff's department, specifying proper COVID-19 procedures. Plaintiff repeatedly complained to Supr. Abaza, approximately twice a week since March 14, 2020, that these safety procedures were not being followed, as Plaintiff had seen co-workers not wearing masks and not sanitize desks after use. Supr. Abaza did not respond to most of Plaintiff's complaints, and on one occasion told Plaintiff, "COVID is a hoax."

11.     Around April, 2020, Plaintiff asked Supr. Abaza if the team could work from home, and only come into the office when needed, as the CTO office was doing. Plaintiff reminded Supr. Abaza of the previous concerns she had raised. Plaintiff added that since there were no flights currently, the team had little work that required to physically be at the airport. Plaintiff explained that if they could copy information from their work laptops onto a USB flash drive, they could work remotely. Supr. Abaza denied this request. When Plaintiff asked for an explanation, Supr. Abaza informed Plaintiff that the County Manager, Marwan Altoumah ("Mgr. Altoumah"), told Supr. Abaza she can run the office however she wants.

12.     In or around 2020, Plaintiff complained to Supr. Abaza that containers of toxic chemicals were being rolled around directly on the floor of their office, and not being carried in their proper equipment. These containers of toxic chemicals had been seized from passengers. Plaintiff also reported that some of these containers were kept in the office permanently, and not disposed of properly. Supr. Abaza replied by vaguely claiming that "We'll have someone clean it out." Plaintiff suggested that they commission World Service West, a janitorial service, to clean up the materials. World Service West is a vendor for Employer, and has provided janitorial services free of charge in the past. Supr. Abaza did not respond to Plaintiff's suggestion.

13.     In or around 2020, Plaintiff was working in the office when she saw an unknown man enter. Plaintiff asked who he was and what he was doing there. The man claimed that one of his friends worked with a vendor, and that friend asked the man to go to the office and retrieve one of the friend's belongings. This vendor had recently concluded business with Employer. Plaintiff asked the friend to leave, and he promptly did so. Later that day, Plaintiff reported the incident to Supr. Abaza. Plaintiff asked Supr. Abaza if they could change the locks every time a vendor stopped doing business with Employer, as it could be a safety hazard to allow anyone to walk into the office. Supr. Abaza claimed she would have someone change the locks. Supr. Abaza never placed an order for this, and the locks remained unchanged until the door broke in August 2020.

14.     In or around 2020, Plaintiff complained that confidential files related to sensitive economic information about Employer's client were not being properly stored. While Plaintiff properly stored the files she worked with, and properly stored the files she found laying out,

Plaintiff asked for assistance from Supr. Abaza in protecting these files. Supr. Abaza replied they were not properly stored because the locks on the file cabinets were broken. Plaintiff asked if Supr. Abaza could speak with higher-ups to fix these cabinets. Supr. Abaza replied she would need to get approval from the Department of Finance (known as the "DFO"), and that she was certain the DFO would refuse this request. Supr. Abaza never did anything further with Plaintiff's complaints.

15.     In or about June of 2021, Plaintiff received an email from Cood. Salah directing Plaintiff to change the number of compensatory hours for employees Operation Agent Mehreteab Zemarian ("Agent Zemarian") and Operation Agent Roberto Aguilar Jimenez ("Agent R. Jimenez"). One of Plaintiff's responsibilities was to review the log-in book at the end of each week. Every employee in Plaintiff's department signed the log-in book when they clocked in and clocked out. The log-in book was located at Plaintiff's desk next to the front door of the office. Cood. Salah directed Plaintiff to remove the hours of overtime the employees had logged, claiming that the employees had "billed too many hours."

16.     Plaintiff refused to do so. Cood. Salah claimed, "They work from 7 A.M. to 4 P.M., but you pay them for a full 8 hours." Plaintiff explained, "They get paid 7 hours plus 1 hour of paid lunch. If they decide to leave at 4 P.M., that's their time, they can do with it what they want. Iman and I count that as them taking lunch and leaving early." Plaintiff added that, "On flight days, they come in 15 minutes early to begin work. Iman and I agree to grant this as overtime, because they start work early to make sure the flight departure goes smoothly."

17.     Plaintiff informed Cood. Salah that Plaintiff believed this to be a labor board violation, and told her, "They aren't given a rest or lunch break, and now you're penalizing them for working?" Cood. Salah replied, "You know I've been working at the airport for a long time, I know the rules." Plaintiff replied, "You work in Washington; Have you ever worked in California in my position? The state of California is very strict about giving employees rest and lunch breaks. Even if an employee were to volunteer not to take lunch, a manager must tell them to take lunch, or send the employee home early. Instead of giving them lunch or letting them go, you want to dock the hours they've worked?"

18.     In or about June 2021, on the Sunday following Plaintiff and Cood. Salah's conversation, Supr. Abaza called Plaintiff. Supr. Abaza informed Plaintiff that Cood. Salah had complained to Supr. Abaza about Plaintiff using inappropriate language and tone during their conversation. Plaintiff replied by explaining she always uses "firm, but appropriate language" when discussing disagreements with colleagues. Plaintiff further explained that she advocated for her co-workers' rights to overtime, emphasized the importance of Californian labor laws, and

-4-

COMPLAINT

warned of the potential consequences for not following those regulations. Plaintiff reminded Supr. Abaza that she was CC'd on this correspondence, and asked Supr. Abaza to review the email chain and alert Plaintiff if Supr. Abaza found any of Plaintiff's language to be inappropriate. Supr. Abaza did not do so.

19.     In or about June of 2021, Cood. Salah called Plaintiff and asked her to audit Supr. Abaza. Cood. Salah specifically alleged that "Iman has a lot of hours and I don't think this is right." Plaintiff, confused, asked, "What do you want me to do?" Cood. Salah replied, "You have all the logs, you can look into it." Plaintiff replied that ordering a lower-ranking employee to audit a higher-up was illegal. Plaintiff replied it was Supr. Abaza's responsibility to audit Plaintiff, therefore, someone above Supr. Abaza should audit Supr. Abaza. Plaintiff added that she does not know Iman's hours before 2014. Plaintiff then explained she felt uncomfortable, as Supr. Abaza was out of the country on leave at the time. Plaintiff suggested that Cood. Salah ask Agent Zemarian to audit Supr. Abaza, as Supr. Abaza had appointed Agent Zemarian as acting supervisor while Supr. Abaza was on leave. Plaintiff then clarified that her only responsibility was to have all the employees log their hours in the attendance book, then submit that book to Supr. Abaza so that she can double-check the hours.

20.     Cood. Salah claimed, "You make the record, you know what to do." Plaintiff responded by emphasizing that she does not make the record or enter hours in for any employees, she just keeps the book they record their hours in. Plaintiff added that Supr. Abaza does not add her hours in until after Plaintiff gives her the record book. Plaintiff then emphasized that with Supr. Abaza away, there is no way to perform a fair audit where Supr. Abaza can defend herself. Plaintiff asked Cood. Salah "Wait until Iman's back, then you can discuss it with her." Plaintiff then messaged Agent Zemarian, asking him to call Cood. Salah to discuss the potential audit.

21.     Later that same day, Plaintiff texted Supr. Abaza to inform her that Cood. Salah requested an audit. Plaintiff then followed up with Agent Zemarian to ask if he called Cood. Salah. Agent Zemarian replied that, "I called Lina, but she never answered my call."

22.     In or around October of 2021, Supr. Abaza asked Plaintiff if she would like to go for a coffee break with Supr. Abaza and co-workers Emily Vasquez and Robert Aguilera. Plaintiff agreed, and during the break, informed Supr. Abaza that Plaintiff noticed Plaintiff's weekly paycheck was about $200 short. Plaintiff informed Supr. Abaza that she had emailed the manager of the DFO, Nahed Osman, about the issue ("Mgr. Osman"), but received no response. Plaintiff then asked Supr. Abaza if Supr. Abaza could provide the number for Human Resources, to which Supr. Abaza replied, "You can find it yourself."

23.     Later that same day, Plaintiff again approached Supr. Abaza to ask what can be done about her lost wages. Supr. Abaza glared directly at Plaintiff, frightening Plaintiff. Supr. Abaza glared at employees who asked questions she did not like.

24.     On or about January 10, 2022, Plaintiff was finishing a report as a part of her weekly duties. To finish the report, Plaintiff needed to pick up a box containing important paperwork. This box was located on the ground of the office, beneath a stack of other boxes. Each box was incredibly heavily due to the hundreds of papers held within. As Plaintiff began lifting the boxes to retrieve the one at the bottom, she began to feel a strain in her back. As Plaintiff picked up the final box, the strain became an intensely sharp pain focused in the middle of her back. Due do the pressing nature of the report, Plaintiff ignored the pain so she could continue with her duties. This sharp pain continued for the rest of the day. No other employees were present to assist Plaintiff.

25.     In-between January 10 and January 12, 2022, Plaintiff informed Supr. Abaza of her injury from January 10, explaining that as she was moving boxes off the floor, she began to feel pain that become severe once she lifted the final box. Supr. Abaza flippantly told Plaintiff, "Maybe you should see a chiropractor." Plaintiff asked Supr. Abaza for the number of Human Resources so she could report the injury. Supr. Abaza replied, "You can find it yourself."

26.     Supr. Abaza did not refer Plaintiff to a worker's compensation physician, did not ask Plaintiff to fill an incident report, nor communicated Plaintiff's complaint to upper management. According to Employer's policy, if an employee reports an injury, that employee must be sent to Employer's worker's compensation physician to determine if the injury was work-related or not.

27.     On or about January 13, 2022, Plaintiff received a call from a coworker. The coworker informed Plaintiff that at a team meeting, Mgr. Adheleb mentioned that Agent Zemarian had tested positive for COVID-19 two weeks prior. Plaintiff had noticed that Agent Zemarian was displaying symptoms of COVID-19 such as severe coughing. Plaintiff was shocked to learn that not only had Agent Zemarian tested positive, but superiors knew and let him continue working in-person. Plaintiff immediately took a rapid test for COVID-19. Plaintiff tested negative.

28.     On or about January 14, 2022, Plaintiff informed Supr. Abaza she had tested negative for COVID-19. Supr. Abaza asked Plaintiff, "Why did you take a test, it doesn't mean anything? COVID is just another flu. The number of deaths reported is negative. We don't need masks or tests or anything. I took a test and I'm not fucking doing it again." Plaintiff responded that "My father-in-law died this past October from COVID, explain to me how he died if the numbers are wrong." Supr. Abaza replied, "He had a condition." Plaintiff explained, "That's the

point: I have a condition. I am diabetic and have high cholesterol."

29.     On or about January 19, 2022, Plaintiff began feeling symptoms of COVID-19, including severe coughing, severe headache, and fatigue. Plaintiff went to her primary care physician's office to take a polymerase chain reaction test, or PCR test, for COVID. Plaintiff's physician informed her that while she had symptoms of COVID-19 but did not have the test results, she had to stay off work. Plaintiff's physician prescribed Plaintiff with time off work for three days, until the test results come back on January 24, 2022.

30.     On or about January 24, 2022, Plaintiff tested negative for COVID-19 and returned to work the following day.

31.     Beginning on or about January 25, 2022, and continuing until Plaintiff's termination, Plaintiff began wearing a heat pad around her back to deal with the intense pain she felt. This pack was worn over Plaintiff's clothes, and was bright yellow in color. This made it plain to see for all who worked near Plaintiff.

32.     Later that same day, Supr. Abaza approached Plaintiff, and asked why she was wearing the heat pad. Plaintiff explained that it was to manager her pain, reminding Supr. Abaza of the January 12 injury. Plaintiff showed the pack to her and explained that "I have to sit with this against my back for my pain."

33.     On or about February 4, 2022, Plaintiff texted Supr. Abaza that "I am having fever, severe back pain and my blood pressure is rising. I am taking emergency pills [referring to Tylenol] from my doctor and try to rest. I won't be able to come today. I will update." Supr. Abaza respond, "That's too bad, but we need some info from you. Mehretab txt you, pls answer him if ur able [sic]." Despite feeling severely sick, and instructed by her physician to rest, Plaintiff assisted Agent Zemarian for fear of retaliation if she did not.

34.     On or about February 7, 2022, Plaintiff visited her chiropractor. Plaintiff's chiropractor prescribed Plaintiff with eleven days off work, from February 7, 2022, to February 18, 2022. Plaintiff's chiropractor ordered Plaintiff to rest, and scheduled a follow-up appointment for February 11, 2022, for an X-Ray. Plaintiff's physician recommended Plaintiff take Advil to manage the pain.

35.     On or about February 11, 2022, Plaintiff had her X-Ray. This formally diagnosed Plaintiff with retrolisthesis of L3 and L4 (in which the L3 and L4 vertebrae in her lower back slipped backward on one another, causing severe back and leg pain), osteophytes (also known as "bone spurs") (largest on the right and L3-4), and disc narrowing on L4-L5 (building-up pressure along Plaintiff's entire spine). Plaintiff's chiropractor set a follow-up appointment for February 17,

2022, and extended Plaintiff's time off.

36.     On or about February 17, 2022, Plaintiff visited her chiropractor for her follow-up appointment. Plaintiff's chiropractor determined that Plaintiff was not well enough to return to work and ordered her to remain off work until March 31, 2022. Plaintiff's chiropractor also referred that Plaintiff see Dr. Robert Washington, an internal medicine specialist ("Dr. Washington"), so that Dr. Washington could perform an MRI.

37.     On or about February 23, 2022, Plaintiff sent the medical certification to Supr. Abaza through text.

38.     On or about March 31, 2022, Plaintiff visited Dr. Washington. Dr. Washington took Plaintiff's blood pressure, and found that it was severely high: 160/100 bp, much higher than the typical average of 120/80. During the appointment, Dr. Washington began the process to get approval from Plaintiff's insurance for the MRI. Dr. Washington extended Plaintiff's time off until April 14, 2022, 2022. Plaintiff's husband handed this medical certification to Supr. Abaza the following day.

39.     On or about April 14, 2022, Plaintiff had her follow-up appointment. Dr. Washington informed Plaintiff her MRI was set for May 2, 2022, and extended Plaintiff's time off until May 19, 2022. Plaintiff texted this medical certification to Supr. Abaza that same day.

40.     On or about May 2, 2022, Plaintiff had her MRI. Dr. Washington prescribed Plaintiff with additional time off work, until May 19, to begin new treatment based on the results. Plaintiff's husband turned in the medical certification the following day. Dr. Washington scheduled a follow-up appointment for May 19, 2022.

41.     On or about May 9, 2022, Cood. Salah emailed Plaintiff, claiming that Plaintiff had utilized all her Illness Protection Benefit (also known as "IPB") days. Cood. Salah alleged that Plaintiff used 67 IPB days in 2021, and 1 IPB day in 2022, meaning that Plaintiff would run out of IPB days on May 12, 2022. This email contained a chart, which allegedly broke down month-by-month when and how Plaintiff used her IPB days.

42.     On or about May 10, 2022, Cood. Salah emailed Plaintiff again, claiming that "The company has reviewed its policies and determined that you do not have available to you additional sick leave or similar benefits to cover the medical time off request provided by your doctor through May 19th [*sic*]." Cood. Salah then alleged that "The company can no longer hold your position open indefinitely," and directed Plaintiff to turn in medical certification clearing Plaintiff to return to work by May 20, 2022. Cood. Salah also informed Plaintiff in this email that Employer would use Plaintiff's vacation days for any time Plaintiff took off in-between May 10, 2022, and May 23,

2022. Plaintiff was not able to send this certification, as she would not know the results of her MRI, and her corresponding ability to work, until May 19, 2022. Further, Plaintiff did not receive this email.

43.     On or about May 18, 2022, Plaintiff replied to Cood. Salah's email, and asked for Cood. Salah to confirm that Cood. Salah worked for Human Resources.

44.     On or about May 19, 2022, Plaintiff had her follow-up appointment. Dr. Washington found that Plaintiff's blood pressure was 160/100 bp, much higher than the typical average of 120/80. Dr. Washington also recorded that Plaintiff's symptoms, particularly her intense pain in her back, had not subsided. Plaintiff was prescribed with additional time-off work until August 19, 2022.

45.     Later that same day, Plaintiff emailed Supr. Abaza to inform Supr. Abaza that Plaintiff's husband will turn in the medical certification to Supr. Abaza the following day. Supr. Abaza asked for Plaintiff's husband to come in at 10 a.m. the next day.

46.     Later that same day, Plaintiff received an email from Cood. Salah, claiming that if Plaintiff did not turn in the medical certification on May 20, 2022, Plaintiff would be terminated effective May 23, 2022. Cood. Salah then claimed that the original May 10, 2022 notice was sent by HR. Cood. Salah further claimed that she does not directly work for HR, but is the "designated representative and administrator under Mgr. Alehedeb." Plaintiff assured Cood. Salah that Plaintiff was doing all she could in light of her medical condition, and that she had been unable to reach Supr. Abaza to give her the medical certification. Plaintiff then said that she did not receive the email from May 10, 2022, and she would not have even be able to inform Cood. Salah if she could return on May 20, 2022, as her results would not come in until May 19, 2022. Plaintiff then informed Cood. Salah that she received the results of her MRI, and was put off work until August 19, 2022.

47.     On or about May 20, 2022, Plaintiff's husband visited Supr. Abaza's office at 10 a.m., only to find Supr. Abaza was absent. Plaintiff called Supr. Abaza, who informed Plaintiff that Supr. Abaza was ordered to work from home that day. Plaintiff then texted the medical certification to Supr. Abaza.

48.     On or about May 22, 2022, Plaintiff emailed Cood. Salah and stated that Plaintiff did not agree to using her vacation days. Plaintiff reminded Cood. Salah that according to section 8.4 on page 31 of the employee handbook, employees received 12 sick days at the start of every year. Plaintiff further explained that 3 of the sick days Plaintiff took off, from January 21 to 25, 2022, were due to a possible COVID-19 infection. As such, these 3 sick days should be reinstated under

the "2022 COVID-19 Supplemental Paid Sick Leave" state law, extended through September 30, 2022. Plaintiff also raised a variety of issues, such as how often she worked from home unpaid, including training Agent B. Jimenez and assisting Agent Zemarian while she was sick. Plaintiff also emphasized the fact that she never received her monthly uniform allowance.

49.     On or about May 26, 2022, Cood. Salah emailed Plaintiff, alleging that Plaintiff had used 68 IPB days, exceeding the limit of 60 days. Cood. Salah agreed that Plaintiff's three days off in January 2022 were able to be reinstated under the state law, and as such Plaintiff had a total of 12 sick days remaining. Cood. Salah claimed that Employer would only be able to hold Plaintiff's position open until June 16, 2022. Cood. Salah threatened that unless Plaintiff was cleared to return to work by then, Plaintiff would be terminated on June 17, 2022.

50.     On or about May 27, 2022, Plaintiff replied that she would like to use her 38 hours of unused compensatory time to cover four days off work until June 3, 2022. Plaintiff then asked to use her 12.825 vacation days to cover until June 22, 2022.

51.     On or about May 31, 2022, Cood. Salah replied that Plaintiff was expected to return June 23, 2022. Cood. Salah then threatened that while Plaintiff was on medical leave until August 19, 2022, Plaintiff would be terminated if she did not return on June 24, 2022.

52.     On or about June 8, 2022, Plaintiff sent Cood. Salah an email notifying Cood. Salah asking for any mail to be forwarded to Plaintiff's in-law's home, and provided the address.

53.     On or about June 24, 2022, Plaintiff received an email from Cood. Salah containing her termination letter, effective June 23, 2022. In this same email, Cood. Salah claimed that Plaintiff would receive her final check via FedEx that afternoon. Plaintiff did not receive her check.

54.     On or about June 28, 2022, Plaintiff received the mailed termination letter. Plaintiff sent an email to Cood. Salah informing her that Plaintiff did not receive her check, and sent her in-law's address again. Cood. Salah replied by alleging that the check was sent on June 24, 2022 and had been delayed. Plaintiff then replied, asking if this final check would cover vacation days Plaintiff used to cover her final days off (specifically, June 16, 2022 to June 22, 2022). Plaintiff also said that if she did not receive the check that day, she would file a complaint with the California Labor Board. Plaintiff did not receive a response to this email.

55.     On or about June 29, 2022, Plaintiff filed a complaint with the California Labor Board regarding the unpaid final check. In addition, Plaintiff did not receive the severance package of 6 months' salary that all Senior Admin Coordinators are given upon termination. At the time of

this writing, Plaintiff has still not been paid for her final check nor given the severance pay.

56.     In or about July 2022, a coworker informed Plaintiff that Mgr. Alehedeb wanted to terminate Plaintiff. The coworker explained that Supr. Abaza relayed to the coworker that Supr. Abaza asked if Mgr. Alehedeb would hire a new Senior Admin Coordinator to replace Plaintiff. Mgr. Alehedeb stated that he would not, as he "hated" Plaintiff to such a degree that he did not even want to replace her position. Mgr. Alehedeb also told Supr. Abaza that he sought to terminate Plaintiff for a period of time. The coworker also told Plaintiff that when Mgr. Alehedeb returned from leave in December 2021, Mgr. Alehedeb told the coworker personally that, "I'm going to get rid of Jennie [a nickname for Plaintiff]. I don't like her, I tried to get rid of her numerous times before, but I couldn't. Now I will get rid of her for sure."

57.     On information and belief, Operation Agent Lena Azadi ("Agent Azadi"), a female co-worker in her 30s, was given the severance package.

58.     On information and belief, Operation Agent Lindsay Phillips, ("Agent Phillips"), a female co-worker in her 30s, was promoted to Sales Executive shortly after Plaintiff's termination.

59.     During the period of Plaintiff's employment with Employer, Plaintiff had, and/or was perceived by Employer as having and/or likely to have disabilities in the future.  These disabilities included but are not limited to diabetes, COVID-19 symptoms, retrolisthesis, osteophytes (also known as "bone spurs"), disc narrowing and related physical symptoms, including severe pain, greatly restricted mobility and severe weakness in the affected parts of the body, and/or other named symptom and related symptoms, conditions and limitations. Plaintiff's disabilities did and/or were regarded by Employer as interfering with and limiting Plaintiff's major life activities, including ability to work. Plaintiff's disabilities required reasonable accommodations, including but not limited to periodic time off work for medical treatment and recuperation from flare ups of symptoms, workplace accommodations. Employer failed and refused to provide reasonable accommodations for Plaintiff's disabilities.

60.     At all relevant times, Plaintiff was qualified for Plaintiff's job position with Employer, and could perform all essential functions of Plaintiff's job, and of reasonably available alternative positions of Employer, with reasonable accommodations, without unreasonably endangering Plaintiff's or anyone else's health or safety.

61.     In or about February 2022, Plaintiff took approximately 4 months of medical leave from work for a serious medical condition that limited Plaintiff's ability to work. Employer failed and refused to engage in a timely good faith interactive process with Plaintiff to identify and provide reasonable accommodations. Employer discouraged Plaintiff from taking time off work for

-11-
COMPLAINT

medical appointments and/or flare-ups in symptoms. Employer failed and refused to provide reasonable accommodations for Plaintiff's disabilities.

62.     In or about March 2014 through June 2022, Plaintiff reported to supervisors, including Supr. Abaza, and/or refused to participate in, Employer's violation of laws and regulations prohibiting discrimination, retaliation, harassment, including Cal. Govt. Code 12940, 12945, 12945.2; Cal. Const. Art. I, Section 8; Cal. Lab. Code including 512, and workplace safety laws including Cal-OSHA. Employer retaliated against Plaintiff's whistleblower activities including by terminating Plaintiff.

63.     Employer was substantially motivated to and did discriminate and retaliate against Plaintiff, including terminating Plaintiff, based upon Plaintiff's protected classes, and Plaintiff's attempts to and exercise of Plaintiff's right to disability and medical leave, and retaliated against Plaintiff's opposition to harassment, discrimination and retaliation.

64.     As the proximate result of Defendant's wrongful conduct, Plaintiff has and will suffer past and future lost wages and benefits in an amount to be determined by the trier of fact, but estimated to be no less than $200,000, and past and future emotional distress and mental suffering estimated to be no less than $300,000.

65.     Los Angeles Station Supervisor Iman (also spelt "Eman") Abaza ("Supr. Abaza"), SAUDI ARABIAN AIRLINES CORPORATION dba SAUDIA Country Manager for the United States Khalid Alehedeb ("Mgr. Alehedeb"), Saudia Arabian Airlines Corporation Operation Manager for the United States Bassam Alsadoon ("Mgr. Alsadoon"), Senior Administrative Coordinator Lina Salah ("Cood. Salah") are managing agents of Employer because on information and belief Employer allowed them to exercise largely unfettered discretion to participate in, authorize and ratify, and to determine whether and how to investigate and discipline evidence of, discrimination, retaliation and harassment and other legal compliance, including but not limited to labor laws, OSHA and their industry's regulations. Employer allowed them to exercise largely unfettered discretion to determine whether and how to enforce legal requirements. These individuals had the discretion to make highly influential hiring and firing recommendations, and manage, supervise, evaluate and discipline other managers, and enter into binding agreements on behalf of Employer. They participated in, authorized and/or ratified the discriminatory, retaliatory and unlawful adverse employment actions against Plaintiff and others.